### UNITED STATES DISTRICT COURT

### MIDDLE DISTRICT OF LOUISIANA

**SHELIA A. IRVIN**

                                        **CIVIL ACTION**

**VERSUS**

                                        **NO. 15-518-JWD-EWD**

**ASCENSION PARISH SCHOOL BOARD**

### RULING AND ORDER

This matter comes before the Court on the *Motion for Summary Judgment* (Doc. 16) filed by Defendant Ascension Parish School Board ("Defendant").  The Plaintiff Shelia A. Irvin ("Irvin" or "Plaintiff") opposes the motion. (Doc. 18.)  Oral argument is not necessary.  Having carefully considered the law, the record, and the arguments of the parties, the motion is denied.

### I.    Introduction

Plaintiff Shelia A. Irvin works for the Defendant Ascension Parish School Board as the Transportation Secretary.  She has worked in that position for about sixteen years and for the Defendant for nearly forty years.

In the fall of 2014, Plaintiff applied for the position of Coordinator of Transportation.  Her supervisor, Larry Grant, testified that she has already performed the Coordinator job, that she trains Coordinators, and that she in fact trained him for his job as Supervisor of Transportation.

Nevertheless, Plaintiff did not receive the position.  Mr. Aubrey Yates did.  The week after being passed over for the new job, Plaintiff was told by the Assistant Superintendent, who was the highest-ranking member of the committee interviewing applicants, that "this was a position that [she] expected the person to work in for at least [ten] or more years."

Plaintiff was born in August 1955, and she was, at the time the job became available, fifty-nine years old.  Yates was born in December 1963 and was fifty years old when he was hired.  Their age difference is approximately eight and one quarter years.

Plaintiff now brings this suit alleging that the Defendant discriminated against her on the basis of her age in violation of the Age Discrimination in Employment Act, 29 U.S.C. § 621 *et seq*. ("ADEA").  Specifically, Plaintiff claims discrimination for failure to promote.

The Court has carefully reviewed the law and the record as a whole and finds that the Defendant's motion should be denied.  First, Plaintiff has made a prima facie case of discrimination.  Though the person who ultimately got the job was over the age of forty, Supreme Court and Fifth Circuit precedent hold that this does not prevent a plaintiff from proving a prima facie case.  As long as the person who received the job was "substantially younger" than the Plaintiff, she has met her burden.  The Court finds that the eight and one quarter year difference between Plaintiff and Yates satisfies this standard.

Though the Defendant has articulated a legitimate, non-discriminatory reason for the decision (namely, that Yates had better qualifications), the Court finds that the Plaintiff has created an issue of fact as to whether this reason was a pretext for discrimination.  Drawing all inferences in the Plaintiff's favor, a reasonable juror could find that age discrimination was the but-for cause of the Defendant's employment decision.  The Court bases this decision on the following: (1) the Plaintiff's prima facie case, (2) the fact that she was "clearly better qualified" than Yates (that is, a jury could conclude that no reasonable person, in the exercise of impartial judgment, could have chosen Yates over the Plaintiff for the Coordinator position); and (3) the above comment by her supervisor about expecting the person who got the job to work for the next ten years, which a reasonable juror could find was made with discriminatory animus on the

part of a person who is either primarily responsible for the challenged employment action or by a person with influence or leverage over the relevant decisionmakers.

Contrary to Defendant's argument, this holding is not in conflict with *Hazen Paper Co. v. Biggins*, 507 U.S. 604, 113 S. Ct. 1701, 123 L. Ed. 2d 338 (1993). *Hazen* found that there is no disparate treatment under the ADEA when the factor motivating the employer is some feature other than the employee's age. Conversely, here the Court finds that a reasonable juror could conclude that the Plaintiff was not promoted because of her age (that is, that age was the but-for cause of the Defendant's employment action). Accordingly, the Defendant's motion is denied.

## II.    Relevant Factual Background

### A.  Plaintiff's Background

Plaintiff is an employee with the Ascension Parish School Board and has been since 1976. (Doc. 18-2 at 2.)  She began as a library clerk. (*Id.*)  She was also a head secretary at East Ascension High School for ten years. (Doc. 18-2 at 3.)  From 1999 to the present, the Plaintiff has been the Transportation Secretary.  (Doc. 16-5 at 9.)

When Plaintiff first got the Transportation Secretary job in 1999-2000, her duties included "taking care of the bus drivers and their substitutes."  (Doc. 16-5 at 4.)  During this time, she also did the state-mandated reports, figured out the bus drivers' routes, and assisted the Transportation Supervisor with the routes. (Doc. 18-2 at 5.)  At that time in the department, there was only a Supervisor of Transportation and a Transportation Secretary. (Doc. 18-2 at 6.)

### B.  Position of Coordinator of Transportation

In 2008, the position of Coordinator of Transportation was created.  (Doc. 18-2 at 6–7.)  The hierarchy was Supervisor of Transportation, then Coordinator of Transportation, and then

Secretary of Transportation.  (Doc. 18-2 at 7.)  To this day, these are the only positions in the department. (Doc. 18-2 at 7.)

Even after the position of Coordinator of Transportation was created, Plaintiff still reported directly to the Supervisor of Transportation. (Doc. 18-2 at 8.)  Plaintiff did not report to the Coordinator. (Doc. 18-2 at 8.)

With respect to the Coordinator's job duties in 2008, Plaintiff testified that "[t]hey took my duties and created that job description for the Coordinator.  So he got some of my duties[,] . . . [such as] [r]eports, taking care of the bus driver [sic], absences, scheduling.  I stopped doing it and gave it to him." (Doc. 18-2 at 9.)  The job description of the Coordinator included responsibility for assisting with scheduling bus routes, for helping bus drivers find substitutes when they couldn't find one," and preparing all state reports. (Doc. 18-2 at 9.)  Plaintiff was still responsible for assisting with routes. (Doc. 18-2 at 9.)

Plaintiff saw the job description for Coordinator because she applied for the position in 2008. (Doc. 18-2 at 10–11.)  She did not get the job; Kennie Ridgdell did. (Doc. 18-2 at 8, 11.)

Larry Grant was Supervisor of Transportation and had been since 2003. (Doc. 18-2 at 6–7, 25.)  He said that the position of Coordinator was created because there was too much to do in the Transportation Department, because they wanted to disperse the work, and because they wanted someone at the office at all times. (Doc. 18-2 at 26.)  They wanted to take some of Grant's duties and some of Plaintiff's duties and give them to a new person. (Doc. 18-2 at 26–27.)  Grant testified that, though Plaintiff did not get the Coordinator job in 2008, she was capable of doing the job at that time. (Doc. 18-2 at 27.)

### C.  The Plaintiff Applies for the Coordinator Position in 2014

When Ridgdell left the job in 2014, a vacancy was created for the Coordinator position, and the Plaintiff applied again. (Doc. 18-2 at 11, 28.)  At the time the job became available, Plaintiff was fifty-nine years old. (Doc. 16-5 at 4.)

The position was a twelve-month job. (Doc. 18-2 at 20.)  Four individuals were interviewed for the Coordinator position: Mr. Aubrey Yates, Ms. Irvin, Mr. Clark Sanchez (a person from ETEL), and Chad Burke (from Associated Grocers). (Doc. 18-2 at 11, 28–29, 43.)

### D.  Mr. Yates Was Selected for the Job

Of the four people interviewed, Mr. Yates was chosen for the job. (Doc. 18-2 at 11, 45.) Yates was born in December of 1963 and was fifty years old at the time he was hired. (Doc. 16-5 at 2; Doc. 18-2 at 39–40.)

Yates worked in real estate from 1991 until "the crash," after which he became a substitute teacher in Ascension Parish, and then he was a paraprofessional at Dutchtown Middle School for four or five years. (Doc. 18-2 at 34–35.)  From there, he went to being a truancy interventionist.  Yates said that he was trained for the Coordinator position by Mr. Grant, but the "job mainly consists of problem solving, and those skills come naturally as you work." (Doc. 18-2 at 37.)  Yates said that his truancy position prepared him for that "as far as dealing with irate parents, administrators, [and] things of that nature:"

> Q:    Give me an example of problems you would solve in the truancy
>       department.
>
> A:    Okay.  You got three drivers at a school with no way to get them home, so
>       you have got to get them home, so you have got to figure out where you
>       got a driver that can make an emergency route there and bring in that
>       driver.
>
> Q:    Or ten people calling in sick on the same day?

A:     That's correct.  You have got to get subs and take care of that.  There's a
       lot of hats to wear in this department.

(Doc. 18-2 at 37.)

Yates said that, since becoming Coordinator, the Plaintiff helps him with "procedures that go[] on in the department when [he] need[s] something[,]" but Yates does the "problem solving" on his own.  (Doc. 18-2 at 38.)  Yates will use the Plaintiff for "specific transportation issues, like what form do we use for this or for a sub or something like that, but as far as policy stuff," he relies on Grant or Chad Lynch, the Director of Planning and Construction. (Doc. 18-2 at 12–13, 38–39, 42.)  Yates said his other main duties that he performs regularly are: "Going to accidents, making sure the kids are safe, getting the correct information to report to the insurance company and to Ms. Peraza's office about what happened, taking pictures.  Dealing with principals as far as problems at their school or student problems they may have problems with." (Doc. 18-2 at 40.)

### E.  The Hiring Committee, The Interviews,  and The Stated Reasons for Selecting Mr. Yates

Four different people performed all the interviews for the Coordinator position:  Denise Graves, Chad Lynch, Larry Grant, and Randy Watts. (Doc. 18-2 at 19.) Denise Graves is the Assistant Superintendent. (Doc. 18-2 at 12.)  As stated above, Chad Lynch's title was the Director of Planning and Construction, but he was also director over transportation and maintenance. (Doc. 18-2 at 12–13, 42.)  Larry Grant, the Supervisor of Transportation, was on the committee as well. (Doc. 18-2 at 6–7, 25.)  He reports to Mr. Lynch. (Doc. 18-2 at 7.)  Randy Watts is the Director of Human Resources. (Doc. 18-2 at 17.)  Ms. Graves had authority over the other individuals on this hiring committee. (*See* Doc. 18-2 at 15–16, 19, 23.)

6

At the interview, the applicants were given an opportunity to give an opening statement, then the four interviewers asked questions. (Doc. 18-2 at 19.)  Mr. Lynch had a list of questions generated and given to the interviewers, which they could ask if they so chose. (Doc. 18-2 at 19.) "The four of us would actively ask the applicant questions based upon their experience and expectations and abilities, and then we would close with them having the opportunity to give a closing statement." (Doc. 18-2 at 19.)  Watts would also give details of the job. (Doc. 18-2 at 19.)

Yates said he did not recall Denise Graves telling him in the job interview that she would expect him to stay in that job for at least ten years. (Doc. 18-2 at 39.)  Similarly, Lynch testified that he did not recall Ms. Graves saying during the interview with Plaintiff that whoever was hired would be expected to work in the job at least ten years or more. (Doc. 18-2 at 43.)

Graves was asked, "What particular attributes did Mr. Yates bring to the table, if you recall," and Graves responded:

> His experience, first of all, being a current employee.  He worked as a truancy interventionist, so he had good skills in working with the school administrators. We needed that feedback we had gotten over time with the difficult situations that he dealt with, that he had a good rapport with administrators that he spoke to them appropriately.
>
> They were pleased with his handling of documents.
>
> Also, because he was a truancy interventionist, he was very familiar with all of the nooks and crannies of the district, so if we asked him to go drive the Buzzard route, he would know where that would be.  He was very familiar with the entire district, which would be a determining factor.  And just the people skills he had been demonstrating as a truancy interventionist.

(Doc. 16-5 at 11–12.)  Yates' bachelor's degree did not "play into it." (Doc. 16-5 at 12; *see also* Doc. 16-5 at 14–15.)  Conversely, Ms. Irvin got an interview because: "She worked for Mr.

Grant.  She worked in the Transportation Department, she had been a longtime, good employee

with us." (Doc. 16-5 at 12.)

Larry Grant testified that, in his opinion as direct supervisor of the Coordinator job, Irvin

"possess[ed] all of the attributes needed in order to assume the position" and was "absolutely"

qualified for the job. (Doc. 18-2 at 29.)  Grant also testified that he preferred Ms. Irvin for the

position:

> A:     It goes back to my statement earlier, and this is no offense to other
>        applicants, but prior to me getting there, Ms. Irvin was in the chair, so she
>        was basically coordinating and doing secretarial work before any of us got
>        to that department.  She had the experience, the professionalism, the
>        organizational skills.  I am who I am right now in that department not
>        because I get all of my information from the State Department or some
>        other agency, it came directly from Ms. Irvin.  She has been the trainer for
>        myself, and she is the trainer now for any Coordinator that comes into that
>        office.
>
>        So with all of that longevity that she has as a Secretary and all of the
>        duties that go along with being a Coordinator, she was doing all of those
>        particulars prior to any of us getting there, so she had that, she possessed
>        those qualities.
>
> Q:     Would the title "Secretary" be a misnomer as far as what Ms. Irvin has
>        done over the years in the department?
>
> A;     Absolutely.

(Doc. 16-5 at 17.)  Grant further testified that, when the Coordinator job came into existence,

Plaintiff's duties were shifted and given to Mr. Ridgdell.  (Doc. 16-5 at 17–18.) Grant testified:

> Q:     And so it was–you wanted her to show him how to do what she had
>        previously been doing?
>
> A:     Absolutely.
>
> Q:     And the same would be true with Mr. Yates?
>
> A:     Absolutely.

(Doc. 16-5 at 18.)

Grant said that Ms. Graves "took the lead for Mr. Yates." (Doc. 16-5 at 18.)  Grant

testified that the final decision came about as follows:

> Discussions at the table about qualifications and abilities and the what-ifs and all
> those things, so everybody was throwing their pieces in the pot.
>
> Again, I will say Ms. Graves was in Mr. Yates' corner, and that is no offense to
> her.  I was standing on my convictions, and eventually, we had to make
> concessions.  We were at a stalemate, for lack of a better word.  I am a team
> player.  Ms. Graves is over all of us that was at that table, including Mr. Lynch, so
> eventually we all decided that we will go in the direction of Mr. Yates.

(Doc. 16-5 at 22–23.)  Grant was asked if he "basically . . . conceded to Ms. Graves' position,"

and he replied, "Absolutely." (Doc. 16-5 at 23.)  When asked if Grant would speak for her again,

he stated:

> Unless somebody brings something really outstanding beyond the shadow of a
> doubt.  Again, you know, when you sit at a table to interview people, it is a
> process.  It is yes, this is who I think is a great person based upon what I know
> about her, and you can say something different about another person.  At some
> point, you have to come together.

(Doc. 18-2 at 32.)

Grant testified that age was never a consideration in making the decision of who to hire,

including Ms. Irvin's age. (Doc. 16-5 at 21.)  Grant said that he could not speak for anyone else.

(Doc. 16-5 at 22.)  However, he did not "recall age being discussed in the general conversation.

Like, you are too old or you have got too many – no.  That conversation was not had openly at

that table." (Doc. 16-5 at 23.)

Chad Lynch testified that Ms. Irvin had the following strengths or good points after they

interviewed her:

> Her strengths would be her presence in the office over there, knowledge of who the bus drivers are, the ability to point people in the right direction in our school system.  She has been in the school system a long time, so there are things she knows about who to call at HR.  Drivers call her and ask questions, and she directs them to the right people. . . . Being involved in transportation, I would tell you that being there in the office is what got her the interview.  I know that she knows what we do in there.

(Doc. 16-5 at 30–31.)  Lynch said they did not discuss anybody's negatives; "it was more of us trying to say who we thought we should recommend and if we had a consensus already or not." (Doc. 16-5 at 31.)  Lynch stated that, though he was not 100% sure, he felt like, based on the job description that was posted, the Plaintiff met all of the qualifications outlined in the job description for the Coordinator position. (Doc. 18-2 at 44.)

Lynch said that Grant "felt like, out of loyalty to Ms. Shelia, [Grant] wanted to give [Plaintiff] a chance.  That was [Grant's] statement, and he explained why, you know.  She had been his employee for a long time, and he wanted to recommend her." (Doc. 16-5 at 31.) Lynch's top candidate was Mr. Sanchez from ETEL because of his transportation experience. (Doc. 16-5 at 31.)  Lynch did not remember if Mr. Watts even picked one, but Ms. Graves wanted Mr. Yates. (Doc. 16-5 at 31.)  Lynch testified:

> We had a vote, then further discussion, and Ms. Graves made some comments about Mr. Yates and the things she had seen with him in his capacity he had before this, which I agreed with because I had seen them as well through my experience with him in his other role.  And once she said that, I said I could live with that.
>
> Mr. Grant, I remember him not objecting, saying he could live with that, and we felt like we could go with that and we all agreed to the selection.

(Doc. 16-5 at 31–32.)

Randy Watts could not remember the pluses that Ms. Graves discussed with respect to Mr. Yates. (Doc. 16-5 at 34.)  He testified:

Mr. Yates got my vote – and I said there was a tie.  If I had to give it for transportation knowledge, it would have been for Mr. Sanchez because he dealt with it on a daily basis.  But Mr. Yates far exceeded everyone else, in my eyes, as far as what I thought was needed within the district, which is total collaboration and understanding of the principals and assistant principals and what they go through and how they operate during the course of a day.

Mr. Yates has had internal experience with those people for a couple of years in dealing with truancy.  He deals with parents with truancy each and every day, and it is very, very hostile sometimes.  A lot of them are not very, very pleased.  A lot of shouting and hollering has come through that office because people believe they should be able to go to any school they want to regardless of where they live.  He is the one who would catch them crossing lines and not telling the truth about where they would live, so on a daily basis, Mr. Yates would deal with employees and adults.  And I thought that was very, very important that we had someone who was experienced in that because when you are dealing with buses, this is what you are going to deal with.  An irate parent who calls in the afternoon, regardless of whether or not they are correct with their information, or they are worried because they think their kid has been kidnapped, whatever it may be, you know, something wrong.  And he has had total experience in dealing with those situations.

So that is why he had my vote . . . One of the reasons.  One of the main reasons he had my vote.

(Doc. 16-5 at 34–35.)

### F.  The Meeting That Took Place After the Interviews and the Alleged Comment

Plaintiff testified that, on the Monday after the interview, Ms. Graves, Mr. Lynch, and Mr. Grant called her in a meeting to explain why she did not get the job. (Doc. 18-2 at 12.) Plaintiff testified that, at the meeting, Graves said "usually when they hire somebody in a position like that, they are expected to work 10 or more years in that position."  (Doc. 16-5 at 5; Doc. 18-2 at 14.)  Plaintiff testified:

Q:    Did she say that to you in a way that made you understand that she didn't believe that you'd be there for 10 years?

A:    That's what I got from it.

11

(Doc. 16-5 at 5; Doc. 18-2 at 14.)  According to Plaintiff, Lynch and Grant said nothing at that meeting. (Doc. 16-5 at 5; Doc. 18-2 at 14.)

Graves also testified about a follow-up meeting that occurred.  (Doc. 16-5 at 13.)  Graves said that she, Grant, Lynch, and Watts met with Plaintiff at a conference room in Sorrento.  (Doc. 16-5 at 13.)  Graves "did all of the talking and wanted to let Ms. Irvin know she was not going to get the position, that we appreciated her applying for the position, but that we had chosen someone else." (Doc. 16-5 at 13.)  Graves was asked if she told the Plaintiff that "this was a position that [she] expected the person to work in for at least 10 or more years," and Graves responded:

> In my conversation in the interview telling her she did not get the position, I did say that.  It was part of the conversation just trying to give an example, as she did not get the position because she wasn't the best person for it, she did not have the best experience and wasn't the most qualified.  I said that as a platform for discussion.  We were looking for someone long-term, but certainly, historically, as an HR person, we have hired people for half a year, 1 year, but that she did not get the position because we were looking for someone long-term.
>
> I did say that we can hire someone and they can resign the next year, but we went with what we were responsible for, which was to pick the best possible person for the position.

(Doc. 16-5 at 13–14.)  She denied that age was a factor in the decision:

> Q:     When you said that because of her longevity in the system, she had worked here for 38 years, and because of her age, did you think she was not going to hold the job for 10 years or more.
>
> A:     Absolutely not.  I don't know we are that far apart in age.  She is a little bit older than I, but I expect to work 10 more years also, so that was not a factor at all.

Graves also discussed other reasons given to Plaintiff for not giving her the position:

> One of the reasons we met with her was just to let her know that we had applicants that certainly had better hands-on experience that would better suit the position.  The position had filled for a number of years, we knew what the daily

tasks were and what the responsibilities were, and those were just not her strengths.  She had no evidence of those strengths or even having those skills. She had never supervised either, never been a situation where she had to deal with different employees or parents, and we had two applicants with that experience.

(Doc. 16-5 at 15.)

Grant also testified about the meeting.  He said that, after the consensus was made to hire Mr. Yates, a decision was made to talk to Ms. Irvin to "smooth things over with her." (Doc. 16-5 at 24.)  The four people who interviewed her sat down with her, and Ms. Graves was the lead in the conversation. (Doc. 16-5 at 25.)  Grant was asked if he remembered Ms. Graves saying that "she expected the person who filled the Coordinator's job to be in the job for at least 10 years," and Grant did not "recall those exact words." (Doc. 16-5 at 25.)  Grant elaborated:

I don't want to misquote Ms. Graves.  I can tell you the process that I think Ms. Graves was trying to allude to.

Get Miss Shelia to the table, and basically, explain to her the reasons why, so in the process of that explanation, if those particular wordings came about directly, I don't want to believe there was anything that was basically to try to make Miss Shelia feel she was inadequate or that she only had a few years left before she retired.  I think she was just trying to explain the reasons why.

So whatever the wording that was quoted or whatever by someone, I don't recall the exact words verbatim, but I do know the gist of what Ms. Graves was trying to do because we talked about it prior.  And we were just trying to make Miss Shelia feel better about the process.

(Doc. 16-5 at 26.)  When Grant was told that Ms. Graves admitted to saying it, he said there was a "strong possibility" that she did, but he only remembered the gist of what she said and not the specifics. (Doc. 16-5 at 27–28.)

Lynch testified that, in a meeting that they had with the Plaintiff after her interview, Ms. Graves said something to the effect that whoever was hired would be expected to work in the job at least [ten] years or more. (Doc. 18-2 at 43.)  Lynch stated:

Q:      And when you heard that, what did you think she meant by that?

A:      Can I just state that the purpose of the meeting was really to try and help an employee understand that even though you were not selected, you are still a valuable employee.

       That sentence to me, or whatever she said about the age didn't appear to me to be the point of the meeting.

Q:      But you did take it to be about her age, right?

A:      I vaguely remember what she said.  It was about longevity or how much time you have left.  I can't remember exactly how she said it.

(Doc. 18-2 at 44.)

## III.    The Relevant Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). If the mover bears his burden of showing that there is no genuine issue of fact, "its opponent must do more than simply show that there is some metaphysical doubt as to the material facts . . .  [T]he nonmoving party must come forward with 'specific facts showing that there is a genuine issue for trial.' " *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586–87, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986) (internal citations omitted). The non-mover's burden is not satisfied by "conclusory allegations, by unsubstantiated assertions, or by only a 'scintilla' of evidence." *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (citations and internal quotations omitted). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.' " *Matsushita Elec. Indus. Co.*, 475 U.S. at 587. Further:

In resolving the motion, the court may not undertake to evaluate the credibility of the witnesses, weigh the evidence, or resolve factual disputes; so long as the evidence in the record is such that a reasonable jury drawing all inferences in

favor of the nonmoving party could arrive at a verdict in that party's favor, the court must deny the motion.

*International Shortstop, Inc. v. Rally's, Inc.,* 939 F.2d 1257, 1263 (5th Cir. 1991).

## IV.   Discussion

### A.   ADEA Standard Generally

The Fifth Circuit recently laid out the applicable law as follows:

> The Age Discrimination in Employment Act (ADEA) "prohibit[s] employers from discharging or otherwise discriminating against any individual because of his or her age." *Miller v. Raytheon Co.,* 716 F.3d 138, 144 (5th Cir. 2013); *see* 29 U.S.C. § 621. Under the ADEA, it is unlawful for an employer "to discharge any individual or otherwise discriminate against any individual . . .  because of such individual's age." 20 U.S.C. § 623(a)(1); *accord Phillips  v. Leggett & Platt, Inc.,* 658 F.3d 452, 455 (5th Cir. 2011). To establish a claim under the ADEA, "[a] plaintiff must prove by a preponderance of the evidence (which may be direct or circumstantial), that age was the 'but-for' cause of the challenged employer decision." *Gross v. FBL Fin. Servs., Inc.,* 557 U.S. 167, 177–78, 129 S. Ct. 2343, 174 L. Ed. 2d 119 (2009). A plaintiff may prove her case by either direct or circumstantial evidence. *Id.*

*Palacios v. City of Crystal City, Tex.*, 634 F. App'x 399, 401–02 (5th Cir. 2015) (per curiam).

The Fifth Circuit has further explained:

> When a plaintiff relies on circumstantial evidence to prove age discrimination, we apply the three-part burden-shifting analysis from *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973). Under the *McDonnell Douglas* framework, the plaintiff must first establish a prima facie case by showing that (1) she was forty years of age or older at the time she was not selected; (2) she was qualified for the position; (3) she was not selected; and (4) either (a) a candidate outside her protected class was selected; (b) someone younger was selected; or (c) she otherwise was not selected because of her age. *See Machinchick v. PB Power, Inc.,* 398 F.3d 345, 350 (5th Cir. 2005); *McClaren v. Morrison Mgmt. Specialists, Inc.,* 420 F.3d 457, 462 (5th Cir. 2005). If the plaintiff establishes a prima facie case, the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for its decision. If the employer meets that burden of production, the plaintiff, to withstand summary judgment, must offer sufficient evidence to create a genuine issue of material fact as to whether "the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." *Squyres v. Heico Cos., L.L.C.,* 782 F.3d 224, 231 (5th Cir.2015) (internal quotation marks and citation omitted).

15

*Cline v. Par.*, 622 F. App'x 423, 425 (5th Cir. 2015) (per curiam).

### B. Plaintiff's Prima Facie Burden

The parties' arguments concerning the prima facie case are straightforward and center on the fourth element of the test. Defendant asserts that the Plaintiff can only show a prima facie case by demonstrating that the position was filled by someone outside the "protected class" (i.e., over the age of forty). Defendant contends that, because Mr. Yates was fifty years old, Plaintiff cannot satisfy her prima facie burden.

Plaintiff maintains that the Defendant cites to incorrect case law. Plaintiff argues that she can satisfy her prima facie burden merely by showing that Mr. Yates was younger than the Defendant and that Courts in the Fifth Circuit have "routinely treated the fourth element as satisfied for summary judgment purposes when the age difference between a plaintiff and his replacement is seven years or more." (Doc. 18 at 7 (citation omitted).)

In short, the Court rejects the Defendant's argument and agrees with the Plaintiff. This case is controlled by *O'Connor v. Consolidated Coin Caterers Corp.*, 517 U.S. 308, 116 S. Ct. 1307, 134 L. Ed. 2d 433 (1996). Under it, the Plaintiff has satisfied her prima facie burden.

In *O'Connor*, the question was "whether a plaintiff alleging that he was discharged in violation of the [ADEA] must show that he was replaced by someone outside the age group protected by the ADEA to make out a prima facie case under the framework established by" *McDonnell Douglas*. *O'Connor*, 517 U.S. at 309, 116 S. Ct. at 1309. In finding that he did not, the Supreme Court explained:

> The discrimination prohibited by the ADEA is discrimination "because of [an] individual's age," 29 U.S.C. § 623(a)(1), though the prohibition is "limited to individuals who are at least 40 years of age," § 631(a). This language does not ban discrimination against employees because they are aged 40 or older; it bans discrimination against employees because of their age, but limits the protected class to those who are 40 or older. The fact that one person in the protected class

16

has lost out to another person in the protected class is thus irrelevant, so long as he has lost out *because of his age.* Or to put the point more concretely, there can be no greater inference of *age* discrimination (as opposed to "40 or over" discrimination) when a 40-year-old is replaced by a 39-year-old than when a 56-year-old is replaced by a 40-year-old. Because it lacks probative value, the fact that an ADEA plaintiff was replaced by someone outside the protected class is not a proper element of the *McDonnell Douglas* prima facie case.

*Id.*, 517 U.S. at 312, 116 S. Ct. at 1310 (emphasis in original).  The high court concluded:

 [T]he prima facie case requires "*evidence adequate to create an inference that an employment decision was based on a[n] [illegal] discriminatory criterion . . . .*" *Teamsters v. United States,* 431 U.S. 324, 358, 97 S. Ct. 1843, 1866, 52 L. Ed. 2d 396 (1977) (emphasis added). In the age-discrimination context, such an inference cannot be drawn from the replacement of one worker with another worker insignificantly younger. Because the ADEA prohibits discrimination on the basis of age and not class membership, the fact that a replacement is substantially younger than the plaintiff is a far more reliable indicator of age discrimination than is the fact that the plaintiff was replaced by someone outside the protected class.

*Id.*, 517 U.S. at 312–13, 116 S. Ct. at 1310 (emphasis in original).  Thus, under *O'Connor*, the

replacement cannot be "insignificantly younger;" he must be "substantially younger."

Relying on *O'Connor*, the Fifth Circuit has explained that the fourth requirement of the

prima facie case is that the plaintiff prove that "she was either (i) *replaced by someone*

*substantially younger* or (ii) otherwise discharged because of her age." *Ripoll v. Dobard*, 618 F.

App'x 188, 191 (5th Cir. 2015) (per curiam) (emphasis added) (citing *Jackson v. Cal–W.*

*Packaging Corp.*, 602 F.3d 374, 378 (5th Cir. 2010) (citing *O'Connor*, 517 U.S. at 312–13, 116

S. Ct. 1307)).  In *Flanner v. Chase Inv. Servs. Corp.*, 600 F. App'x 914 (5th Cir. 2015) (per

curiam), the Fifth Circuit articulated the same standard from the same cases and stated:

The Supreme Court has clarified that the prima facie case requires evidence adequate to create an inference that an employment decision was based on an illegal discriminatory criterion.  In the age-discrimination context, such an inference cannot be drawn from the replacement of one worker with another worker insignificantly younger. Thus, a plaintiff's replacement must be "substantially younger" to create an inference of discrimination.

*Id*. at 917–18 (alterations, footnotes, and quotations omitted).

Defendant claims that this rule has applied in other ADEA cases (*e.g*., discharge, termination, or replacement) but does not apply in failure-to-promote cases. But Defendant cites to no authority, and provides no good reason, for this proposition. Moreover, case law from this and other circuits shows that *O'Connor* applies in failure-to-promote cases. *See Cline v. Par.*, 622 F. App'x 423, 425 (5th Cir. 2015); *Shelley v. Geren*, 666 F.3d 599, 608 (9th Cir. 2012) ("In a failure-to-promote case, a plaintiff may establish a prima facie case of discrimination in violation of the ADEA by producing evidence that . . . (4) the promotion was given to a substantially younger person." (citations, one of which is *O'Connor*, omitted)); *McKay v. U.S. Dep't of Transp.*, 340 F.3d 695, 698 (8th Cir. 2003) ("First, the [district] court ruled that [the employee] did not establish a prima facie case [of a failure to promote claim] because (i) . . . the selected candidate[] was over age forty and therefore a member of the ADEA protected class, . . . . We disagree. As to [the selected candidate's] age, 'the fact that a replacement is significantly younger than the plaintiff' satisfies this aspect of the prima facie case. [*O'Connor*, *supra*.]."); *Murphree v. Potter*, 226 F. Supp. 2d 826, 831 (N.D. Miss. 2002) ("Such reasoning [from *O'Connor*] applies with equal force in a failure to promote context. . . . The defendant has failed to advance a sufficient rationale which would justify applying such a principle only in cases other than a failure to promote context. [(citation omitted)]"). Thus, the Court will apply *O'Connor* here.

As a result, the only question is whether Mr. Yates is substantially younger than the Plaintiff. Yates was born on December 5, 1963. (Doc. 18-2 at 39–40, 45.) Plaintiff was born on August 26, 1955. (Doc. 16-5 at 4; Doc. 16-5 at 4.) Consequently, there is a roughly eight and one-quarter year difference in age between Yates and Plaintiff.

The Court finds this age difference is sufficient to satisfy the Plaintiff's prima facie burden. "Unlike some [other] circuits, [the Fifth Circuit] has not settled on a standard for what age difference qualifies as 'substantially younger' such that an inference of age discrimination may be made to establish a prima facie case." *Flanner*, 600 F. App'x at 919 (citations omitted). "This [circuit] has stated: '[t]he ADEA does not lend itself to a bright-line age rule . . . in which replacement by a worker outside the protected category is a convenient proof guideline.' " *Id.* (quoting *Bienkowski v. Am. Airlines, Inc.*, 851 F.2d 1503, 1506 (5th Cir. 1988)); *see also Ruth v. Eka Chemicals, Inc.*, 92 F. Supp. 3d 526, 530 (N.D. Miss.), *reconsideration denied*, No. 13-165, 2015 WL 3673134 (N.D. Miss. June 12, 2015), *and aff'd*, 623 F. App'x 281 (5th Cir. 2015) ("Neither the Supreme Court nor the Fifth Circuit has provided a bright-line rule to determine which age differences are considered substantial and which are considered insubstantial." (citations omitted)). Nevertheless, as the district court stated in *Ruth*:

> The Fifth Circuit has, however, stated in dicta that five years presents a "close question" as to whether the age difference is legally sufficient, [*Rachid v. Jack In The Box, Inc.*, 376 F.3d 306, 313 (5th Cir. 2004)], and has held four years to be insubstantial as a matter of law. *Earle v. Aramark Corp.,* 247 Fed. Appx. 519, 523 (5th Cir. 2007).

> Without any clear guidance on the issue, district courts within the Fifth Circuit have routinely treated the fourth element as satisfied for summary judgment purposes when the age difference between a plaintiff and his replacement is seven years or more. *See Frazier v. Lockheed Martin Operations Support, Inc.,* 2013 WL 2897897, at *4 (S.D. Miss. June 13, 2013) (finding that age differences of seven, eight, and seventeen years were sufficient for purposes of the plaintiff's prima facie case). *See* [*Hall v. Sealy, Inc.*, 2011 WL 4389701, at *5 (N.D. Tex. Sept. 21, 2011)] (declining "to conclude as a matter of law that an age difference of more than nine years is insubstantial"); *Bell v. Raytheon Co.,* 2009 WL 2365454, at *6 (N.D. Tex. July 31, 2009) (assuming that an approximately seven-year difference is substantial); *Daly v. Home Depot U.S.A., Inc.,* 2007 WL 4260900, at *5 (W.D. Tex. Dec. 3, 2007) (finding that a difference of seven years is a "close question," but assuming for summary judgment purposes that it is sufficient); *Cannon v. St. Paul Fire & Marine Ins. Co.,* 2005 WL 1107372, at *4 (N.D. Tex. May 6, 2005) ("The Court is not prepared to declare an age difference of approximately seven years insubstantial as a matter of law.").

*Id.*, 92 F. Supp. 3d at 530–31; *see also Baiamonte v. Sizeler Real Estate Mgmt. Co.*, No. CIV. A. 96-1732, 1997 WL 3256, at *3 (E.D. La. Jan. 3, 1997) ("with specific regard to the age discrimination claims, the Court finds that the nine-year differential in age between the plaintiff and her replacement does present a jury issue under *O'Connor*[.]").

Based on these cases, the Court finds that the Plaintiff has made a prima facie burden of discrimination; an eight and one-quarter age difference makes Yates "substantially younger" than the Plaintiff for purposes of this prong of the analysis.

### C.  Legitimate, Nondiscriminatory Reasons

Because Plaintiff has made a prima facie case of discrimination, the burden shifts to the Defendant to produce evidence of a legitimate, non-discriminatory reason for Yates being selected for the job. *Cline*, 622 F. App'x at 425.  Defendant quotes at length much of the above testimony from Graves, Watts, Lynch, and Grant and argues that Yates was a "better fit" and more qualified for the position that the Plaintiff. (*See* Doc. 16-2 at 10; Doc. 19 at 3.)

Preliminarily, the Court is skeptical of the Defendant's vague claim that Yates was a "better fit." As the Fifth Circuit held in *Patrick v. Ridge*, 394 F.3d 311 (5th Cir. 2004):

> In fact, the explanation given by [the employer], i.e., that [the employee] was not "sufficiently suited" for the position–even including [the hiring official's] belief that she would not "fit in"–does not necessarily qualify as a "nondiscriminatory" reason. After all, a hiring official's subjective belief that an individual would not "fit in" or was "not sufficiently suited" for a job is at least as consistent with discriminatory intent as it is with nondiscriminatory intent: The employer just might have found the candidate "not sufficiently suited" *because of* a protected trait such as age, race, or engaging in a protected activity. We hold as a matter of law that justifying an adverse employment decision by offering a content-less and nonspecific statement, such as that a candidate is not "sufficiently suited" for the position, is not specific enough to meet a defendant employer's burden of production under *McDonnell Douglas.* It is, at bottom, a non-reason.

*Id.* at 317.

Nevertheless, the Court finds that the Defendant has satisfied its burden of production; viewing the statements of Graves, Watts, Lynch, and Grant as a whole, it is clear that some of them believed that Yates had better qualifications, experience, or skills for the job.  Specifically:

- Graves pointed to his experience, explaining, "He worked as a truancy interventionist, so he had good skills in working with the school administrators." (Doc. 16-5 at 11–12.)  He dealt with difficult situations, had a good rapport with administrators, and pleased them "with his handling of documents." (Doc. 16-5 at 11–12.)  He was very familiar with district and had the right people skills. (Doc. 16-5 at 11–12.)  Additionally, in explaining her discussion with the Plaintiff on the day following Yates' selection, Graves said that Plaintiff "did not get the position because she wasn't the best person for it, she did not have the best experience and wasn't the most qualified." (Doc. 16-5 at 13–14.)

- Though Grant supported the Plaintiff, he said that the final decision came about through "[d]iscussions at the table about qualifications and abilities." (Doc. 16-5 at 22–23.)

- Lynch said he could live with the choice of Mr. Yates because Lynch had seen what Graves had said about Yates and because of Lynch's own experience with him. (Doc. 16-5 at 31–32.)

- Watts testified that Yates "far exceeded everyone else . . . as far as what [he] thought was needed within the district, which is total collaboration and understanding of the principals and assistant principals and what they go through and how they operate during the course of a day." (Doc. 16-5 at 34–35.)  Watts pointed to Yates' "internal experience with those people for a couple of years in dealing with truancy," particularly his experience with parents, "very, very hostile" situations, and "shouting and hollering."  Watts said it was "very, very important that [they] had someone who was experienced in that" because of the need to deal with buses and irate parents. (Doc. 16-5 at 34–35.)

Thus, Defendant has satisfied its burden at this stage of the *McDonnell Douglas* analysis. "[T]he promotion of a better qualified applicant is a legitimate and nondiscriminatory reason for preferring the successful applicant over the rejected employee who claims that the rejection was discriminatory." *Price v. Fed. Exp. Corp.*, 283 F.3d 715, 721 n. 2 (5th Cir. 2002) (quoting

*Jefferies v. Harris Cty. Cmty. Action Ass'n.*, 693 F.2d 589, 590 (5th Cir.1982)).  The Court notes

that the only question here is whether the Defendant has "introduce[d] evidence which, *taken as*

*true*, would *permit* the conclusion that there was a nondiscriminatory reason for the adverse

action;" "the burden-of-production stage determination necessarily *precedes* the credibility-

assessment stage." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 509, 113 S. Ct. 2742, 2749,

125 L. Ed. 2d 407 (emphasis in original). In short, Defendant has satisfied its burden of

production, so the Court must turn to the final prong of the analysis.

### D.  Pretext

#### 1. Parties' Arguments

Defendant argues that all of the above evidence shows that there were legitimate reasons

for selecting Mr. Yates.  Defendant addresses the after-interview meeting in which Graves stated

that she hoped the employee would work for ten years and states that this comment contained

"no mention of the age of anyone involved."  Defendant says there is no evidence that any

participant knew the age of the final two candidates.

The Defendant also argues that there is no evidence of disparate treatment.  Addressing

Graves' comment further, the Defendant relies on *Hazen Paper Co. v. Biggins*, 507 U.S. 604,

113 S. Ct. 1701, 123 L. Ed. 2d 338 (1993), where the Supreme Court said that there "is no

disparate treatment under ADEA when the factor motivating the employer is some feature other

than the employee's age" and that it "would be incorrect to say that a decision based on years of

service – which is analytically distinct from age – is necessarily age based." The Defendant

quotes *Hazen* at length and concludes by saying that *Hazen* "clearly draws a distinction between

years of service and a legitimate age based discrimination claim.  There is no evidence to suggest

that her rejection was due to some belief that her productivity and competence had declined or

would decline." (Doc. 16-2 at 16.)

Plaintiff concisely argues that an inference of discrimination can be drawn from the

following:

(a) Ms. Irvin had been working for the Board for [thirty-eight] years; Mr. Yates had only been working for the Board for approximately six years.

(b) Ms. Irvin had been working in the Transportation Department for over [fifteen] years; Mr. Yates had never worked in the Transportation Department.

(c) Ms. Irvin had performed the job duties of the Coordinator of Transportation and had trained others how to perform those duties; Mr. Yates had done neither.

(d) Ms. Irvin was told that she was not hired for the position because it was expected that the person hired would work for [ten] or more years; Mr. Yates was not told that he would be expected to [work] for at least [ten] years if hired.

(e) Ms. Graves had direct line authority over the persons on the committee that selected Mr. Yates for the position and used her position of authority to convince the other members of the interview committee to be "team players" and support her selection of Mr. Yates for the position.

(Doc. 18 at 9.)  Plaintiff argues that Graves' statement that Plaintiff "did not get the position

because we were looking for someone long-term" is, when viewed in a light most favorable to

the Plaintiff, an assumption that she, a fifty-nine year old, "was not expected to work 10

additional years – an age-based assumption specifically prohibited by the ADEA." (Doc. 18 at

9.)  Lastly, Plaintiff says that *Hazen* is not applicable:

In that case, an employee was terminated because he was "close to vesting" in the company's retirement program after nine years of service – not because of his age.  In the present case, Ms. Irvin was not promoted because of the assumption made by Ms. Graves that Ms. Irvin, who was 59 years old, was not expected to work 10 additional years (an issue that was not even raised with the person hired

for the position).  This is the precise type of stereotype that is prohibited by the ADEA.

(Doc. 18 at 10.)

Defendant responds that Plaintiff was a secretary, so she lacked the "daily interaction with parents, principals, administrators and/or outside knowledge of the logistics and physical boundaries of the transportation department" and thus did not have the "set of experiences and skills that were so important to the committee members." (Doc. 19 at 3.)  Yates had those skills. Defendant argues that Plaintiff can point to nothing making her a "better fit" or more qualified than Yates.  Defendant says that there is no evidence that the committee's reasons were "weak, implausible, inconsistent, incoherent or contradictory;" Yates "simply was and is more qualified for the duties of that position." (Doc. 19 at 3–4.)  Defendant concludes that there was no evidence of pretext, so Plaintiff's claims should be dismissed.

## 2. Analysis

"If the employer provides a legitimate, non-discriminatory reason, then the burden shifts back to the plaintiff to prove that the employer's proffered reason was not true–but was instead a pretext for age discrimination–or that, even if the employer's reason is true, [s]he was terminated because of h[er] age." *Palacios v. City of Crystal City, Tex.*, 634 F. App'x 399, 402 (5th Cir. 2015) (citation and quotations omitted).   "At the summary judgment stage, the question is whether the plaintiff has shown that there is a genuine issue of material fact as to whether this reason was pretextual." *Id.* (citation and quotation omitted).  "A plaintiff may show [a genuine issue of material fact regarding] pretext either through evidence of disparate treatment or by showing that the employer's proffered explanation is false or unworthy of credence." *Id.* (citation and quotation omitted). The key issue with pretext is whether the employer's justification, "even if incorrect, was the real reason for the plaintiff's termination. A plaintiff's prima facie case,

combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated." *Goudeau v. Nat'l Oilwell Varco, L.P.*, 793 F.3d 470, 476 (5th Cir. 2015) (alterations, citations, and quotations omitted). "At the end of the day, the pretext inquiry asks whether there is sufficient evidence demonstrating the falsity of the employer's explanation, taken together with the prima facie case, to allow the jury to find that discrimination was the but-for cause" of the failure to promote. *Id.* at 478.

Having carefully considered the law, facts in the record, and arguments of the parties, the Court finds that a reasonable juror could conclude that age was the but-for cause of the Defendant failing to promote the Plaintiff.  The Court bases this conclusion on the following: (1) the Plaintiff's prima facie case; (2) the fact that she was clearly better qualified than Yates; and (3) Graves' comment about the Plaintiff not working for ten years, along with Graves' position of authority and influence over the other committee members.

First, the prima facie case was detailed above.  In short, Plaintiff, a woman in her upper fifties, was denied a promotion that went to someone substantially younger than she was.  The Court notes that, "although it does not defeat her prima facie case, the fact that [Yates] was within the protected class is not irrelevant . . . . [Yates'] status as a protected class member . . . cuts against any inference of discrimination by [Defendant] on the basis of age." *Murphree*, 228 F. Supp. 2d at 837 (citations omitted).  But, though weakened, the prima facie case is still relevant on the issue of pretext. *See Baiamonte,* 1997 WL 3256, at *3 ("The Court does find significant in the defendant's favor that the plaintiff was replaced by a 47 year old female with computer skills and that all but one of the other [the employer's] office managers were of the same protected class as the plaintiff. However, with specific regard to the age discrimination

claims, the Court finds that the nine-year differential in age between the plaintiff and her replacement does present a jury issue under *O'Connor*[.]")

The second issue (qualifications) is a close call. "A showing that the unsuccessful employee was ' "clearly better qualified" (as opposed to merely better or as qualified) than the employees who are selected' will be sufficient to prove that the employer's proffered reasons are pretextual." *Moss v. BMC Software, Inc.*, 610 F.3d 917, 922–23 (5th Cir. 2010) (quoting *EEOC v. La. Office of Cmty. Servs.*, 47 F.3d 1438, 1444 (5th Cir. 1995)). To meet this burden, Plaintiff "must present evidence from which a jury could conclude that 'no reasonable person, in the exercise of impartial judgment, could have chosen the candidate selected over the plaintiff for the job in question.' " *Id.* (quoting *Deines v. Texas Dep't of Protective & Regulatory Servs.*, 164 F.3d 277, 280–81 (5th Cir. 1999)). "Unless the qualifications are so widely disparate that no reasonable employer would have made the same decision, any differences in qualifications are generally not probative evidence of discrimination." *Id.* (alterations, citations, and quotations omitted). "An attempt to equate years served with superior qualifications is unpersuasive." *Id.* at 923 (alterations, citations, and quotations omitted). "Obviously, work experience is one component of defining who is more qualified, but greater experience alone will not suffice to raise a fact question as to whether one person is clearly more qualified than another." *Id.* at 923 (citation and quotations omitted). "Thus, 'the bar is set high for this kind of evidence.' " *Id.* (quoting *Celestine v. Petroleos de Venezuella SA*, 266 F.3d 343, 357 (5th Cir.2001)). As the Fifth Circuit has stated a number of times:

> The ADEA was not intended to be a vehicle for judicial second-guessing of employment decisions nor was it intended to transform the courts into personnel managers. The ADEA cannot protect older employees from erroneous or even arbitrary personnel decisions, but only from decisions which are unlawfully motivated.

26

*Id.* at 926 (quoting *Bienkowski v. Am. Airlines, Inc.,* 851 F.2d 1503, 1507–08 (5th Cir. 1988)).

Nevertheless, even considering this high burden, the Court finds, construing the evidence in a light most favorable to the Plaintiff, that she has met the burden.  Putting aside those parts of the record that demonstrate the Plaintiff had superior experience[1] (which, though relevant, are not dispositive), the Court finds particularly important and convincing Grant's testimony  that the Plaintiff trained him in his position as Supervisor, that she trains the Coordinator in his position, and that her title as Secretary is "absolutely" a misnomer:

> A:      It goes back to my statement earlier, and this is no offense to other applicants, but prior to me getting there, Ms. Irvin was in the chair, so she was basically coordinating and doing secretarial work before any of us got to that department.  She had the experience, the professionalism, the organizational skills.  I am who I am right now in that department not because I get all of my information from the State Department or some other agency, it came directly from Ms. Irvin.  She has been the trainer for myself, and she is the trainer now for any Coordinator that comes into that office.
>
> So with all of that longevity that she has as a Secretary and all of the duties that go along with being a Coordinator, she was doing all of those particulars prior to any of us getting there, so she had that, she possessed those qualities.
>
> Q:      Would the title "Secretary" be a misnomer as far as what Ms. Irvin has done over the years in the department?
>
> A;      Absolutely.

(Doc. 16-5 at 17.)

---

[1] As stated above, Plaintiff had fifteen years of experience working in the Transportation Department (Doc. 16-5 at 4, 9).  According to both Plaintiff and Larry Grant, the Plaintiff had performed the job duties of Coordinator of Transportation prior to the creation of the position. (Doc. 18-2 at 9, 26–27).  Grant, her supervisor, testified that Plaintiff was capable of doing the job even at the time the position was created. (Doc. 18-2 at 27.)  Conversely, Yates had no experience in the Transportation Department and had worked only briefly as a truancy interventionist. (*See* Doc. 18-2 at 34–35.)

Conversely, Yates' alleged superior qualifications are vague and unclear; the committee members say that he has "good rapport with the administrator" (Doc. 16-5 at 11–12), that he had the right "people skills" (Doc. 16-5 at 11–12), that he had "total collaboration and understanding of the assistant principals and what they go through and how they operate during the day" through his time with truancy (Doc. 16-5 at 34–35), and that he dealt with "very, very hostile" situations. (Doc. 16-5 at 34–35.)  None of the administrators provide any specifics on how these facts make Yates more qualified than someone who has performed the duties for the position and who in fact trained the position's supervisor.  Yates himself referred to his "problem solving . . . skills" (Doc. 18-2 at 37), which strike the Court as vague, entirely subjective, and unworthy of credence.

In sum, drawing all inferences in the Plaintiff's favor, a reasonable juror could have found that no reasonable person, in the exercise of impartial judgment, could have chosen Yates over the Plaintiff for the Coordinator job.  This further supports a finding of pretext.

Third, "[r]emarks by a supervisor showing discriminatory animus may be utilized by a plaintiff to demonstrate pretext." *Goudeau*, 793 F.3d at 477 (citation and quotations omitted). "This makes sense as the pretext inquiry is asking the ultimate question whether a jury could find discrimination caused" the adverse employment action. *See id.* (citation omitted).

The Fifth Circuit has explained:

In a circumstantial case[,] . . .  in which the discriminatory remarks are just one ingredient in the overall evidentiary mix, we consider the remarks under a more flexible standard. To be relevant evidence considered as part of a broader circumstantial case, the comments must show: (1) discriminatory animus (2) on the part of a person that is either primarily responsible for the challenged employment action or by a person with influence or leverage over the relevant decisionmaker.

*Id.* at 475–76 (finding that comments by supervisor about "old farts" and about employee wearing "old man clothes" "easily meet this less stringent standard") (citations and internal quotations omitted); *see also Machinchick v. PB Power, Inc.,* 398 F.3d 345, 353 (5th Cir. 2005) (holding that vice president's e-mail announcing the continuation of his "recruiting plan" to "strategically hire some younger engineers and designers to support and be entered by the current staff," along with "age stereotyping remarks" such as claiming an employee had a " 'low motivation to adapt' to change" and describing him as "inflexible," "not adaptable," and possessing a "business-as-usual attitude," was evidence of discrimination).

The Court finds that Plaintiff meets this standard.  As stated above, Graves was asked if she told the Plaintiff that "this was a position that [she] expected the person to work in for at least [ten] or more years," and Graves responded, "In my conversation in the interview telling her she did not get the position, I did say that." (Doc. 16-5 at 13–14.)  Plaintiff was asked, "Did she say that to you in a way that made you understand that she didn't believe that you'd be there for [ten] years?", and she replied, "That's what I got from it." (Doc. 16-5 at 5; Doc. 18-2 at 14.) A reasonable juror drawing inferences in the Plaintiff's favor could conclude from Graves' comment that she had a discriminatory animus and that the Plaintiff did not get the job because of her age.

This conclusion is further supported by the testimony of Yates and one of the committee's own members.  Yates testified that he did not recall Graves asking him in the job interview that she would expect him to stay in that job for at least ten years, and Lynch testified that he did not recall Graves telling the Plaintiff during her interview that whoever was hired would be expected to work in the job at least ten years or more. (Doc. 18-2 at 39, 43.)  These facts support the conclusion that Graves' explanation for the comment – that she was looking for

someone long term (Doc. 16-5 at 13–14) – was unworthy of credence and that age was the real motivation for the statement.

Moreover, Lynch stated:

Q:      And when you heard that, what did you think she meant by that?

A:      Can I just state that the purpose of the meeting was really to try and help an employee understand that even though you were not selected, you are still a valuable employee.

That sentence to me, *or whatever she said about the age* didn't appear to me to be the point of the meeting.

Q:      But you did take it to be about her age, right?

A:      I vaguely remember what she said.  It was about longevity or how much time you have left.  I can't remember exactly how she said it.

(Doc. 18-2 at 44 (emphasis added).)  Construing this exchange in a light most favorable to the Plaintiff, the Court finds that even one of the Defendant's own hiring officials interpreted the comment as being about age.

Additionally, this remark was made by someone who was either "primarily responsible for the challenged employment action or by a person with influence or leverage over the relevant decisionmakers."  As explained above, Graves was the Assistant Superintendent and had authority over the other committee members. (*See* Doc. 18-2 at 15–16, 19, 23.)  Moreover, Grant was asked if he "basically . . . conceded to Ms. Graves' position," and he replied, "Absolutely." (Doc. 16-5 at 23.)  He also stated that "Ms. Graves [was] over all of us that was at that table, including Mr. Lynch, so eventually we all decided that we will go in the direction of Mr. Yates." (Doc. 16-5 at 22–23.)  This testimony indicates that all the committee members agreed to Yates because of Graves' authority.

Construing all of this in a light most favorable to the Plaintiff, the Court finds that

Graves' comments, combined with the prima facie case and the fact that the Plaintiff was

"clearly better qualified," are sufficient to create a genuine issue of material fact on the issue of

pretext.  That is, looking at the record as a whole and drawing all inferences in favor of the

Plaintiff, a reasonable juror could find that the Defendant's stated reasons are unworthy of

credence and that age discrimination was the but-for cause of the employment decision.

The Court further finds that this decision is consistent with *Hazen*.  There, plaintiff

worked as a technical director for a paper company owned and operated by two cousins.  *Hazen*,

507 U.S. at 606, 113 S. Ct. at 1704.  He was fired at the age of sixty-two.  *Id.*  He filed suit under

the ADEA. *Id.*  The jury found in favor of the plaintiff.  *Id.*

The First Circuit affirmed on the issue of liability, relying "heavily on evidence that [the

paper company and cousins] fired [the technical director] to prevent his pension benefits from

vesting." *Id.*, 507 U.S. at 607, 113 S. Ct. at 1704.  The paper company's "pension plan had a

[ten]-year vesting period and . . . [the plaintiff] would have reached the [ten]-year mark had he

worked 'a few more weeks' after being fired." *Id.*  The paper company offered to keep the

plaintiff as an advisor, which would not have entitled him to pension benefits. *Id.*  The appellate

court found that a reasonable jury could have found that the plaintiff was fired "before his

pension rights vested . . . [and] that age was inextricably intertwined with the decision to fire

[him].  If it were not for [his] age, sixty-two, his pension rights would not have been within a

hairsbreadth of vesting." *Id.*, 507 U.S. at 607, 113 S. Ct. at 1705.

The Supreme Court granted writs on the following issue: "does an employer's

interference with the vesting of pension benefits violate the ADEA?" *Id.*, 507 U.S. at 608, 113 S.

Ct. at 1705.  The high court noted the split in appellate courts on the issue and then "clarif[ied]

31

that there is no disparate treatment under the ADEA when the factor motivating the employer is

some feature other than the employee's age." *Id.*, 507 U.S. at 609, 113 S. Ct. at 1705.  After

discussing the nature of disparate treatment, the Supreme Court explained:

> Disparate treatment, thus defined, captures the essence of what Congress sought
> to prohibit in the ADEA. It is the very essence of age discrimination for an older
> employee to be fired because the employer believes that productivity and
> competence decline with old age. As we explained in *EEOC v. Wyoming,* 460
> U.S. 226, 103 S. Ct. 1054, 75 L. Ed. 2d 18 (1983), Congress' promulgation of the
> ADEA was prompted by its concern that older workers were being deprived of
> employment on the basis of inaccurate and stigmatizing stereotypes.
>
>> "Although age discrimination rarely was based on the sort of animus
>> motivating some other forms of discrimination, it was based in large part
>> on stereotypes unsupported by objective fact. . . . Moreover, the available
>> empirical evidence demonstrated that arbitrary age lines were in fact
>> generally unfounded and that, as an overall matter, the performance of
>> older workers was at least as good as that of younger workers." *Id.,* at 231,
>> 103 S. Ct., at 1057-1058.
>
> Thus the ADEA commands that "employers are to evaluate [older] employees . . .
> on their merits and not their age." *Western Air Lines, Inc. v. Criswell,* 472 U.S.
> 400, 422, 105 S. Ct. 2743, 2756, 86 L. Ed. 2d 321 (1985). The employer cannot
> rely on age as a proxy for an employee's remaining characteristics, such as
> productivity, but must instead focus on those factors directly.
>
> When the employer's decision *is* wholly motivated by factors other than age, the
> problem of inaccurate and stigmatizing stereotypes disappears. This is true even if
> the motivating factor is correlated with age, as pension status typically is. Pension
> plans typically provide that an employee's accrued benefits will become
> nonforfeitable, or "vested," once the employee completes a certain number of
> years of service with the employer. See 1 J. Mamorsky, Employee Benefits Law §
> 5.03 (1992). On average, an older employee has had more years in the work force
> than a younger employee, and thus may well have accumulated more years of
> service with a particular employer. Yet an employee's age is analytically distinct
> from his years of service. An employee who is younger than 40, and therefore
> outside the class of older workers as defined by the ADEA, see 29 U.S.C. §
> 631(a), may have worked for a particular employer his entire career, while an
> older worker may have been newly hired. Because age and years of service are
> analytically distinct, an employer can take account of one while ignoring the
> other, and thus it is incorrect to say that a decision based on years of service is
> necessarily "age based."

*Id*, 507 U.S. at 610–11, 113 S. Ct. at 1706–07 (emphasis in original).  The Supreme Court found *Hazen* illustrative of this principle, explaining:

> Perhaps it is true that older employees of Hazen Paper are more likely to be "close to vesting" than younger employees. Yet a decision by the company to fire an older employee solely because he has nine-plus years of service and therefore is "close to vesting" would not constitute discriminatory treatment on the basis of age. The prohibited stereotype ("Older employees are likely to be ___") would not have figured in this decision, and the attendant stigma would not ensue. The decision would not be the result of an inaccurate and denigrating generalization about age, but would rather represent an *accurate* judgment about the employee-that he indeed is "close to vesting."

*Id.*, 507 U.S. at 611–12, 113 S. Ct. at 1707.  The Supreme Court acknowledged that an employer could not legally fire an employee to prevent pension benefits from vesting, as this would violate ERISA; "[b]ut it would not, without more, violate the ADEA.  That law requires the employer to ignore an employee's age (absent a statutory exemption or defense); it does not specify *further* characteristics that an employer must also ignore." *Id.*, 507 U.S. at 612, 113 S. Ct. at 1707.  "An employer [does not] violate the ADEA whenever its reason for firing an employee is improper *in any* respect." *Id.* (emphasis in original). The Supreme Court then provided by way of example: "it cannot be true that an employer who fires an older black worker because the worker is black thereby violates the ADEA. The employee's race is an improper reason, but it is improper under Title VII, not the ADEA." *Id.*

The Supreme Court then limited its opinion:

> We do not preclude the possibility that an employer who targets employees with a particular pension status on the assumption that these employees are likely to be older thereby engages in age discrimination. Pension status may be a proxy for age, not in the sense that the ADEA makes the two factors equivalent . . . , but in the sense that the employer may suppose a correlation between the two factors and act accordingly. Nor do we rule out the possibility of dual liability under ERISA and the ADEA where the decision to fire the employee was motivated both by the employee's age and by his pension status. Finally, we do not consider the special case where an employee is about to vest in pension benefits as a result of his *age,* rather than years of service . . . , and the employer fires the employee in order to prevent vesting. That case is not presented here. Our holding is simply

> that an employer does not violate the ADEA just by interfering with an older
> employee's pension benefits that would have vested by virtue of the employee's
> years of service.

*Id.*, 507 U.S. at 612–13, 113 S. Ct. at 1707–08.  The Supreme Court ultimately remanded the

case to the Court of appeals to determine whether there was sufficient evidence for a reasonable

jury to find an ADEA violation. *Id.*, 507 U.S. at 614, 113 S. Ct. at 1308.

Here, the Defendant's reliance on *Hazen* is misplaced.  *Hazen* held that an employer does

not violate the ADEA by interfering with an older employee's pension benefits – or that there is

no disparate treatment under the ADEA when the factor motivating the employer is some feature

other than the employee's age.  But *Hazen* does not mean that age was not the but-for cause of

the employment action in this case.  Defendant is, in a sense, begging the question.

Rather, the Court already held above that a reasonable juror could conclude from Graves'

comment, the prima facie case, and Plaintiff's clearly better qualifications that the Defendant did

deny a promotion to the Plaintiff because of her age.  That is, a reasonable juror could conclude

that the Defendant based its decision, not on any vesting, but on an inaccurate and stigmatizing

stereotype that the Plaintiff would be unable or unwilling to work in ten years solely because her

productivity would fall and/or because she was already fifty-nine.  As *Hazen* said, the ADEA

commands that "employers are to evaluate [older] employees . . . on their merits and not their

age," *id.*, 507 U.S. at 611, 113 S. Ct. at 1706 (quoting *Western Air Lines, Inc.*, 472 U.S. at 422,

105 S. Ct. at 2756), and, construing Graves' comment in a light most favorable to the Plaintiff,

Defendant failed to do so here.  Unlike *Hazen*, when the Court draws all inferences in favor of

the Plaintiff, it must conclude that age was the but-for cause of the employment decision.

In sum, considering (1) the Plaintiff's prima facie case; (2) the fact that Plaintiff was

clearly better qualified than Yates; and (3) Graves' comment and her authority over the other

members of the committee, a reasonable juror could conclude that the Plaintiff's offered reasons

34

are unworthy of credence and that Plaintiff was discriminated against because of her age.  Given this genuine issue of material fact, summary judgment is not warranted, and the case should proceed to trial.

### V.      Conclusion

Accordingly,

**IT IS ORDERED** that the *Motion for Summary Judgment* (Doc. 16) filed by Defendant Ascension Parish School Board is **DENIED**.

Signed in Baton Rouge, Louisiana, on <u>January 24, 2017</u>.


_____
**JUDGE JOHN W. deGRAVELLES**
**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF LOUISIANA**